# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

HEATHER D. CORRILL,                                    Case No. 1:20-cv-289
      Plaintiff,                                      Litkovitz, M.J.

      vs.

COMMISSIONER OF                                        **ORDER**
SOCIAL SECURITY,
      Defendant.

Plaintiff Heather D. Corrill brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

(Commissioner) denying plaintiff's application for disability insurance benefits (DIB). This

matter is before the Court on plaintiff's Statement of Errors (Doc. 14) and the Commissioner's

response in opposition (Doc. 17).

## I. Procedural Background

Plaintiff protectively filed her application for DIB on April 12, 2016, alleging disability

since June 1, 2012, due to panic attacks, chest pain, nausea, hypertension, hyperlipidemia,

urinary incontinence, Crohn's disease, cerebral palsy, depression, history of self-catheterization,

and cystitis. (Tr. 125, 277). The application was denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative

law judge (ALJ) Stuart Adkins. Plaintiff and a vocational expert (VE) appeared and testified at

the ALJ hearing on January 11, 2019. On March 20, 2019, the ALJ issued a decision denying

plaintiff's DIB application. This decision became the final decision of the Commissioner when

the Appeals Council denied review on February 13, 2020.

**II. Analysis**

**A. Legal Framework for Disability Determinations**

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2019.

2. [Plaintiff] has not engaged in substantial gainful activity since June 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. [Plaintiff] has the following severe impairments: Cerebral palsy; Crohn's disease; irritable bowel syndrome (IBS); gastritis; neurogenic bladder status-post stimulator implantation; degenerative disc disease of the lumbar spine; hip bursitis; hypertension; aortic atherosclerosis; obesity; depressive disorder; and anxiety disorder (20 CFR 404.1520(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that [plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to the following additional limitations: [plaintiff] is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently. She is able to stand and/or walk for about 4 hours and sit for about 6 hours in an 8-hour workday. [Plaintiff] would be permitted to alternate between sitting and standing every 15 minutes while at the workstation. She should never climb ladders,

ropes, or scaffolds. She is able to climb ramps and stairs, balance, stoop, kneel, crouch and crawl on an occasional basis. She should avoid unprotected heights and dangerous machinery. She is able to perform tasks that are not at a production rate pace or have strict production quotas. She is able to tolerate occasional interaction with supervisors, coworkers and the general public; and occasional changes to a routine work setting defined as 1-2 per week.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

7. [Plaintiff] was born [in] . . . 1971 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569a).[2]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from June 1, 2012, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-26).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

---

[1] Plaintiff's past relevant work was as a data entry clerk (sedentary exertion, semi-skilled position, SVP 4); a fast-food worker (light exertion, unskilled position, SVP 2); a cashier/checker (light exertion, semi-skilled position, SVP 3); and a telephone solicitor (sedentary exertion, semi-skilled position, SVP 3). (Tr. 25, 100-01).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light exertion, unskilled, SVP 2 occupations such as office mail clerk (75,000 jobs in the national economy), copy machine operator (85,000 jobs in the national economy); and office helper (100,000 jobs in the national economy). (Tr. 26, 102).

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).  *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.     Relevant Medical Evidence

#### 1.     Corrill Agape Counseling Center

Plaintiff sought mental health treatment at Corrill Agape Counseling Center beginning on January 18, 2012.  (Tr. 845-54).  Plaintiff reported that she had been experiencing depression, low self-esteem, and difficulty communicating with her husband.  (Tr. 846).  Plaintiff returned to counseling with some frequency through August 2012.  (*See* Tr. 846-53) (documenting sixteen visits).  A year lapsed, however, before plaintiff returned for two additional sessions in September 2013 and November 2013.  (Tr. 854).  There is no further record of mental health counseling.

#### 2.     Cardiology: Brian Schwartz, M.D.

Plaintiff treated with a physician assistant in cardiologist Dr. Schwartz's office in July 2012 to follow up on high blood pressure and elevated pulse readings that had been recorded at a recent OB/GYN visit.  (Tr. 346).  Plaintiff reported that she was "under a lot of stress between work and home" and suffered from anxiety.  (*Id.*).  Dr. Schwartz assessed plaintiff with hyperlipidemia, hypertension, near syncope, and a history of aortic atherosclerosis, portal hypertension, and cirrhosis.  (*Id.*).  Dr. Schwartz increased plaintiff's hyperlipidemia and hypertension medication dosages, and the physician assistant noted his belief that "a lot of [plaintiff's] symptoms are related to the anxiety."  (*Id.*).

Plaintiff continued to treat with Dr. Schwartz through November 2014 (four visits over the next approximately 2.5 years) for evaluation of aortic atherosclerosis, hypertension, and hyperlipidemia.  (Tr. 347-58).  During that time, Dr. Schwartz assessed plaintiff with aortic

atherosclerosis; hyperlipidemia; hypertension; cardiomyopathy; fatigue; and a history of Crohn's disease, portal hypertension and cirrhosis. (Tr. 350-51).

       3.      <u>Primary care: Dyrk Vanvalkenburg, M.D. and Chandan Gupta, M.D.</u>

In February 2014, plaintiff saw Dr. Vanvalkenburg for anxiety. (Tr. 410). Plaintiff described stress related to her work, relationships with family members, and finances. (Tr. 411). On mental status examination, Dr. Vanvalkenburg found plaintiff's mood anxious; her affect angry but not blunt, labile or inappropriate; and her mood depressed. (Tr. 410). He did not note irregularities in her communication or speech. (*Id.*). Dr. Vanvalkenburg assessed unspecified anxiety and dysthymia. (*Id.*). He refilled her Xanax prescription for anxiety, prescribed Cymbalta, and recommended formal counseling, which plaintiff did not pursue. (Tr. 410-11).

In November 2015, plaintiff presented to Dr. Gupta with urinary frequency, urgency, and dysuria (occurring over the prior week) with some bilateral flank pain. (Tr. 373). Dr. Gupta noted plaintiff's history of interstitial cystitis, that plaintiff was due to see her urologist the following month, that she had had Botox injection in the past, and that she had been awaiting approval for sacral nerve stimulator. (*Id.*). Plaintiff was assessed with an uncomplicated UTI without evidence of pyelonephritis or interstitial cystitis. (*Id.*). Plaintiff returned to Dr. Gupta with similar complaints in March 2016, and he again assessed a UTI without evidence of pyelonephritis. (Tr. 365).

In December 2015, plaintiff presented to Dr. Vanvalkenburg with depression, but she also reported that her medications were "making a big difference." (Tr. 371). On mental status examination, Dr. Vanvalkenburg noted plaintiff had a normal mood and affect; was alert and

oriented to person, place and time; and appeared well-nourished with no distress. (*Id.*).

Plaintiff's behavior and thought content were normal. (*Id.*). Dr. Vanvalkenburg assessed

dysthymia, a panic attack, and depression. (*Id.*). Plaintiff returned later that month, complaining

of worsening right low back and hip pain. (Tr. 370). Flexeril and Robaxin did not help her pain,

but she had not yet tried Norco. (Tr. 369-70). Dr. Vanvalkenburg noted normal effort and

breath sounds, no respiratory distress, normal range of motion, no edema, and decreased range of

motion of the lower back. (Tr. 369). He assessed right-sided low back pain without sciatica and

recommended therapy and conditioning of the lower back. (Tr. 369).

In February 2016, plaintiff presented to Dr. Vanvalkenburg with back pain and exhibited

edema (1+ pitting ankle edema to the left lower extremity). (Tr. 367). Plaintiff had not begun

the recommended therapy, and Dr. Vanvalkenburg noted that the edema was likely due to a long

drive from Florida. (*Id.*). He assessed right sided low back pain without sciatica and dysthymia.

(*Id.*).

In May 2016, plaintiff presented to Dr. Vanvalkenburg with back pain. (Tr. 363).

Plaintiff reported that issues related to her cerebral palsy and interstitial cystitis—including back

pain, hip pain, leg pain, and bladder incontinence—were interfering with her ability to work.

(*Id.*).

        4.    <u>Urology: Ayman Mahdy, M.D., Ph.D.</u>

Plaintiff consulted with Dr. Mahdy for complaints of pelvic pain and urinary

incontinence in October 2012. (Tr. 442-44). Dr. Mahdy noted grade 1 cystocele with

hypermobility, continued Pyridium, and prescribed Ditropan.  (Tr. 444).  He recommended a

follow up in two months.  (*Id.*).

Plaintiff did not return until August 2013, ten months later, presenting with cystocele,

bladder issues, rectocele, and urgency incontinence.  (Tr. 445).  Dr. Mahdy assessed cystocele II,

rectocele I, and uterine prolapse I.  (Tr. 447).  The next month, September 2013, plaintiff

received a pessary and reported that a bladder relaxant improved her symptoms.  (Tr. 448).  In

November 2013, still reporting progress with the pessary and medication, plaintiff decided to

proceed with surgery.  (Tr. 451).

In October 2014, plaintiff underwent cystoscopy with Botox injections to treat urinary

incontinence and developed urinary retention, requiring a Foley catheter.  (Tr. 474).  Plaintiff

underwent an additional surgery to treat incontinence in April 2015.  (Tr. 454).  Plaintiff had

additional Botox injections in October 2015, May 2016, and November 2016.  (Tr. 466-67, 472-

73, 596-98).  In December 2016, plaintiff began sacral nerve stimulation therapy (InterStim).

(Tr. 564-66, 577-78, 832-37).

### 5.  Gastroenterology: Rajeev Mehta, M.D.

Plaintiff treated with Dr. Mehta in January 2015 for a history of gastric ulcer and

gastroesophageal reflux disease (GERD).  (Tr. 822).  Dr. Mehta observed that her gastric ulcers

were "healed[,]" her reflux was "controlled" and her irritable bowel syndrome was "stable."  (Tr.

825).  By July 2015, Dr. Mehta also described plaintiff's Crohn's disease as "stable."  (Tr. 824).

In August 2016, plaintiff presented with abdominal pain related to Crohn's disease and

GERD.  (Tr. 615).  Plaintiff reported that she stopped her medication for Crohn's disease on her

own.  (*Id.*).  At that time, Dr. Mehta found the status of plaintiff's Crohn's disease "unclear" given that plaintiff had stopped her related medication.  (Tr. 617).  In December 2016, Dr. Mehta diagnosed chronic superficial gastritis without bleeding.  (Tr. 620).  He also noted that plaintiff's GERD was "[c]ontrolled on current therapy" and her Crohn's disease "appear[ed] to be stable." (*Id.*).  In January of 2017, Dr. Mehta noted that plaintiff was not taking medication for her Crohn's disease.  (Tr. 621).  In August 2017, Dr. Mehta noted that a July 2017 colonoscopy reflected "no residual Crohn's disease."  (Tr. 770).  In December 2017, Dr. Mehta assessed gastritis, and by August 2018, plaintiff reported "no abdominal pain."  (Tr. 763).

### 6.  Consultative Examination: Nancy Schmidtgoessling, Ph.D.

Dr. Schmidtgoessling evaluated plaintiff for disability purposes on August 25, 2016. (Tr. 526-34).  Plaintiff described her chief complaints as cerebral palsy, depression, Crohn's disease, bladder problems, and mobility problems.  (Tr. 527).

On mental status examination, plaintiff described depression, weight loss, low energy, crying spells, and panic attacks.  (Tr. 530).  Plaintiff demonstrated fidgeting during the interview but no abnormal mental content or bodily concerns.  (Tr. 530-31).  Dr. Schmidtgoessling assessed plaintiff to be in the average range of intelligence with fair insight and judgment.  (Tr. 531).  When discussing her daily activities, plaintiff reported that she was able to handle personal hygiene, grocery shopping, washing "a few" dishes, driving, sweeping the floor, and laundry. (Tr. 532).  Plaintiff reported eating out in lieu of cooking and that her husband maintains the finances.  (*Id.*).  Plaintiff reported occasional church attendance.  (*Id.*).

Dr. Schmidtgoessling diagnosed unspecified depressive and anxiety disorders.  (Tr. 534).

She opined that plaintiff's memory for remote information appeared adequate.  (Tr. 533).

Plaintiff recalled only two of three words after five minutes and only three digits forward, which

Dr. Schmidtgoessling understood to convey potential difficulty initially acquiring information

but not difficulty with understanding and following simple job instructions.  (*Id.*).  Plaintiff

reported that when she was working, stress and depression would sometimes cause her to cry and

leave before the end of her shift.  (*Id.*).  Dr. Schmidtgoessling therefore opined that plaintiff's

depression may negatively impact her persistence and pace on a job.  (*Id.*).  Plaintiff reported that

she has not had problems interacting with others, though she reported virtually no social

interaction.  (*Id.*).  Plaintiff also reported that her depression and distress have negatively

impacted her job stress tolerance, but she did not specifically report panic attacks.  (Tr. 534).

7.    State agency review: mental impairments

State agency psychologist Maura Clark, Ph.D., reviewed plaintiff's file in September

2016[3] and determined that a medically determinable impairment was present that did not

precisely satisfy the diagnostic criteria for either Listing 12.04 or Listing 12.06.  (Tr. 114-15).

Under the B criteria for these Listings, Dr. Clark concluded that plaintiff experienced mild

restrictions in her activities of daily living and mild difficulties in maintaining social functioning;

experienced moderate difficulties in maintaining concentration, persistence, or pace; and

---

[3] The Social Security Administration (agency) revised the criteria for evaluating mental disorders, effective January 17, 2017.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,167 (Sept. 26, 2016).  Because Dr. Clark reviewed the record prior to January 17, 2017, she applied the prior version of the criteria. The prior criteria were: 1) restriction of activities of daily living, 2) difficulties in maintaining social functioning, 3) difficulties in maintaining concentration, persistence, or pace, and 4) repeated episodes of decompensation, each of extended duration.  (*See* Tr. 115).

experienced no episodes of decompensation of extended duration. (Tr. 115). Dr. Clark opined that plaintiff could understand, remember, and carry out semi-skilled tasks; relate on a superficial and ongoing basis with co-workers and supervisors; attend to tasks for a sufficient period to complete them; and manage stresses involved with semi-skilled work. (Tr. 120).

State agency psychologist Katherine Fernandez, Psy.D., reviewed plaintiff's file upon reconsideration in May 2017 and agreed with Dr. Clark's conclusion regarding Listings 12.04 and 12.06. (Tr. 132). Under the new regulations, Dr. Fernandez found mild difficulties in understanding, remembering, or applying information and in interacting with others; and moderate difficulties in concentrating, persisting, or maintaining pace and in adapting or managing oneself. (Tr. 132). Regarding plaintiff's mental residual functional capacity, Dr. Fernandez concluded:

> [Plaintiff] can understand, remember, and carry out moderately complex tasks in a setting without strict time pressures or quotas. [Plaintiff] can relate with others, but should not be required to supervise others or work around crowds or with groups of more than 3 coworkers. [Plaintiff] can attend to tasks for a sufficient period to complete tasks as long as she does not have to frequently multi-task. [Plaintiff] can manage occasional changes.

(Tr. 138).

### 8. State agency review: physical impairments

Non-examining physician Angela Bucci, D.O., reviewed the record in July 2016 and found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of four hours; and sit for about 6 hours in an 8-hour workday. (Tr. 117-119). Dr. Bucci limited plaintiff to never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and avoiding

all exposure to hazards. (Tr. 117-18). Non-examining physician Anton Freihofner, M.D., reviewed plaintiff's file upon reconsideration agreed with Dr. Bucci's assessments in May 2017. (Tr. 134-36).

**E. Specific Errors**

Plaintiff alleges that the ALJ erred in his assessment of the paragraph B criteria under Listings 12.04 and 12.06. Plaintiff also alleges that the ALJ erred by failing to fully consider the VE's testimony, including her opinion regarding the effect of off task behavior, additional breaks, and additional absences.

1.    <u>Listings 12.04 and 12.06.</u>

In her first and second assignments of error, plaintiff argues that the ALJ erred when he found that her depression did not meet Listing 12.04 and her anxiety did not meet Listing 12.06. She argues that the record reflects her depressive and anxiety disorders for purposes of paragraph A of Listings 12.04 and 12.06. Plaintiff relies on both the opinions of Dr. Schmidtgoessling and the state agency psychologists as well as her testimony during the administrative hearing to demonstrate that she satisfies the paragraph B criteria for each Listing.[4]

The Commissioner argues in response that paragraph A of the Listings is irrelevant because the ALJ's decision turned on the paragraph B criteria. (*See* Tr. 19). The Commissioner also argues that the ALJ relied on substantial, objective medical evidence in finding that plaintiff did not meet the paragraph B criteria for either Listing. Finally, he argues that the opinions of the examining and reviewing psychologists support the ALJ's conclusion.

---

[4] The paragraph B criteria for each listing are identical. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).

At Step Three, plaintiff carries the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653 ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Otherwise, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* at 641 (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a Listing's criteria).

Listing § 12.04 establishes the criteria for depressive, bipolar, and related disorders; and Listing § 12.06 establishes the criteria for anxiety and obsessive-compulsive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04, 12.06. To meet the Listings' severity level for these categories of disorders, a claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraph B or C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

The ALJ identified plaintiff as having severe depressive and anxiety disorders for purposes of paragraph A (Tr. 18), and his opinion discusses the fact that plaintiff did not satisfy the paragraph B criteria with respect to Listing 12.04 of 12.06 (Tr. 19). The Court therefore limits its analysis to the paragraph B criteria.[5]

---

[5] The ALJ also found that plaintiff did not meet the paragraph C criteria (*see* Tr. 20-21), but plaintiff does not challenge this finding. Therefore, plaintiff has waived any challenges regarding the paragraph C criteria. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.") (citation omitted).

In evaluating mental impairments, the ALJ must rate the degree of functional limitation associated with a plaintiff's medically determinable mental impairments. 20 C.F.R. § 404.1520a(c). The ALJ is to rate limitations in four broad functional areas. *Id.* at § 404.1520a(c)(3). Effective January 17, 2017, the paragraph B criteria for Listings 12.04 and 12.06 include the following four functional areas:

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B). In rating limitations, ALJs are to use the following five-point scale: none, mild, moderate, marked, and extreme, with the latter being "incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4). *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F. To satisfy Listing 12.04 or 12.06, the ALJ must find "[e]xtreme limitation of one[] or marked limitation of two" of these broad functional areas. *Id.* at §§ 12.04(B), 12.06(B).

The ALJ's determination that plaintiff did not meet the paragraph B criteria of either Listing 12.04 or 12.06 is based on substantial evidence. The ALJ noted that plaintiff failed to engage in any mental health counseling or other psychiatric care as of the time she made her DIB claim and, as such, Dr. Schmidtgoessling's examination was the "most comprehensive mental examination" in the record. (Tr. 19). The ALJ referred to Dr. Schmidtgoessling's assessment of plaintiff's mental status as "grossly normal" other than depression, low energy, and fidgeting.

He also referenced Dr. Schmidtgoessling's opinions that plaintiff could have difficulty initially acquiring information and that her depression could negatively impact her persistence and pace on a job. (*Id.*) (*see also* Tr. 533). The ALJ assigned Dr. Schmidtgoessling's opinion "partial weight" due to her use of vague descriptions but also found her opinion to be consistent with the objective medical evidence of record. (*Id.*).

The ALJ next considered the opinions of the state agency psychologists. He noted that Dr. Clark had found only mild limitations in the old functional areas of activities of daily living and maintaining social functioning; moderate limitations in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration. (Tr. 20) (*see also* Tr. 115). The ALJ noted that Dr. Fernandez found mild limitations in the current functional areas of understanding, remembering, or applying information and interacting with others; and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself. (*Id.*) (*see also* Tr. 132). The ALJ assigned these opinions partial weight based on the fact that, consistent with Dr. Schmidtgoessling's opinion, he found more limitations in plaintiff's social functioning than what the state agency psychologists had assessed. (Tr. 20).

Based on Dr. Fernandez's limitation ratings in the current functional areas, which were consistent with Dr. Clark's ratings in the old functional areas, the ALJ found no marked limitations in the current functional areas. (*Id.*) *Cf.* 20 C.F.R. § 404.1526(c) (in the context of medical equivalence with a Listing, the federal regulations acknowledge that the agency will consider the opinions of state agency psychological consultants). *See also* SSR 17-2p, 2017 WL 3928306, *3 (March 27, 2017) ("[State agency psychologists] consider the evidence and make

administrative medical findings about medical issues, including whether an individual's impairment(s) meets or medically equals a listing. [They are] highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims. . . .").

The objective medical evidence in the record also supports the ALJ's findings. The ALJ noted that plaintiff appeared only to have sought treatment specifically for mental health issues (in the form of counseling) in 2012 and 2013 and that such counseling was primarily focused on marital issues. (Tr. 24) (citing Tr. 846-54). The ALJ further noted that while other medical records note plaintiff's depression, anxiety, and related prescription medications, they also reflect her overwhelmingly normal mood, affect, and behavior, along with the effectiveness of her prescription medications. (*Id.*) (citing family practice records, Tr. 369, 371, 386, 390, 548; urology records, Tr. 470; back pain related record, Tr. 505; emergency treatment records, Tr. 748, 837).

Plaintiff does not object to or address any of this evidence as it relates to the ALJ's Listing 12.04 determination. Instead, after briefly summarizing the opinions of Dr. Schmidtgoessling and the state agency psychologists, she simply declares that "it is evident that [her] mental functioning is *markedly* impaired regarding her ability to understand, remember, or apply information, as well as the ability to concentrate, persist or maintain pace." (Doc. 14 at PAGEID 992) (emphasis added). This conclusion is not consistent with much less compelled by these physicians' assessments. The only specific evidence that plaintiff identifies as contrary to the ALJ's conclusion or the mental impairment opinions of record is her own testimony. (*See* Tr.

98) ("Q. [H]ow does [depression] . . . manifest itself?  A. I -- it takes over, . . . it prevents me from doing things . . . [e]njoying anything[.]").

Plaintiff employs the same approach with respect to Listing 12.06—summarizing but not disagreeing with the psychological opinions of record and yet declaring that "it is evident that [her] mental functioning is *markedly* impaired, specifically with her ability to interact with others, do activities of daily living, maintain social function, and maintain concentration, persistence, and pace. . . ."  (Doc. 14 at PAGEID 994-95) (emphasis added).[6]  Here, however, plaintiff fails to identify testimony or other evidence that might support the marked limitations that she alleges are related to her anxiety.

Plaintiff carries the burden of proof for the first four steps of the sequential evaluation. *Walters v. Comm'r Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citations omitted).  The ALJ's determination that plaintiff failed to satisfy the paragraph B criteria for Listings 12.04 and 12.06 is supported by substantial evidence.  Plaintiff points to nothing in the record to disrupt this conclusion.  Plaintiff's first and second assignments of error are overruled.

2.    Plaintiff's physical residual functional capacity[7]

Plaintiff argues that the ALJ failed to fully consider certain portions of the VE's expert testimony that accurately portrayed her physical impairments.  In particular, she argues that the ALJ did not incorporate the VE's response to hypotheticals incorporating (1) two additional,

---

[6] Plaintiff cites "PageID #64" for this proposition without a corresponding document number.  The Court believes plaintiff to refer to the portion of the ALJ's decision finding only mild or moderate limitations in each of the four functional areas, which does not support her contention.  (*See* Doc. 9-2 at PAGEID 64; Tr. 20).

[7] Plaintiff does not argue that the ALJ erred in evaluating her mental residual functional capacity; therefore, plaintiff has waived any challenges regarding her mental residual functional capacity.  *See Kuhn.*, 709 F.3d at 624.

unscheduled, 15-minute breaks requiring plaintiff to be away from her desk; (2) being off task 15% of the day due to chronic pain; and (3) being absent three days per month. (Tr. 102-103). Plaintiff argues that these hypotheticals, which the VE determined would eliminate competitive employment at any exertional level (*see* Tr. 103), are applicable to her due to the myriad of bladder issues associated with her IBS, Crohn's disease, and cerebral palsy. Plaintiff also argues that the ALJ's base hypothetical, which assumed that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently (*see* Tr. 101), is inconsistent with her own testimony that she could only lift 10 pounds (*see* Tr. 97). Finally, plaintiff disagrees with the ALJ's determination that her Crohn's disease diagnosis "appears to be resolved with no ongoing symptoms or functional limitations. . . ." (Tr. 23).

The Commissioner responds that the ALJ accurately summarized the medical evidence in the record in detailed fashion. (Plaintiff, for her part, admits that she "agrees generally with the summary of the medical facts contained in [the ALJ's opinion]" but disputes his "interpretation of those facts and his opinions based upon them. . . ."). (Doc. 14 at PAGEID 986). The Commissioner also argues that the ALJ reasonably considered and assigned partial weight to the opinions of the state agency physicians, which specifically took into account plaintiff's bladder problems and related procedures; sciatica and back pain; obesity; gait dysfunction; and difficulties with walking long distances, squatting, and balancing.

The ALJ relied on substantial evidence in declining to incorporate the more restrictive hypotheticals that he had proposed to the VE during the administrative hearing (additional unscheduled breaks, off-task time, and absences) into his physical residual functional capacity

determination.  As related to plaintiff's bladder issues, the ALJ extensively discussed and considered the objective medical evidence.  (*See* Tr. 22-23).  He concluded, however, that while her issues had been "challenging for a brief period of time, . . . overall she responded well to treatment and did not pursue substantial follow up as recommended for many of these procedures and her complaints of urinary tract infections." (Tr. 23).  (*See, e.g.,* Tr. 444-45 (plaintiff followed up approximately 10 months following October 2012 visit, though Dr. Mahdy had recommended a 2-month follow up); Tr. 454 (urologist's certified nurse practitioner noting that plaintiff did not complain of leakage, urgency or frequency at April 28, 2015 visit); Tr. 832 (noting that though plaintiff complained of nearly monthly urinary tract infections over the past year, medical records reflected only two positive tests); Tr. 837, 840 (though September 2017 record reflects a recommended 6-month follow up to address recurrent urinary tract infections, the only further urology visit was for a device check in June 2018 at which plaintiff did not report any UTI symptoms)).

The ALJ also identified objective medical evidence that cut against the alleged severity of her symptoms related to her other medical conditions.  As to IBS, the ALJ pointed to medical records from plaintiff's gastroenterologist suggesting that her late 2016 upper left quadrant pain was related to mild chronic superficial gastritis, not IBS, and reflecting no abdominal pain as of August 2018.  (*See* Tr. 23) (citing Tr. 618 and 763).  As to Crohn's disease, the ALJ pointed to medical records from mid-2015 and late 2016 suggesting that the condition appeared stable. (*Id.*) (citing Tr. 620 and 824).

As to plaintiff's alleged back and hip pain, the ALJ pointed to medical records suggesting that some of this pain was the result of urinary tract infections. (*Id.*) (citing Tr. 414, 748). Other medical records reflecting back pain (independent of urinary tract issues) reflected only minor issues. (*Id.*) (citing Tr. 369 (tenderness and decreased range of motion in the lower back); Tr. 502 (spasm, tenderness, pain on palpation, positive left straight leg test); Tr. 430-31 (lumbar x-ray reflecting no significant scoliosis or acute abnormality and only mild degeneration)). Finally, the ALJ noted that plaintiff failed to follow up with physical therapy and chiropractic treatments were somewhat effective. (Tr. 23-24) (citing Tr. 538 (record showing failure to attend physical therapy sessions); Tr. 729-738 (chiropractic records reflecting some improvement with treatment)).

As to cardiology issues, the ALJ cited to medical records reflecting that her hyperlipidemia and hypertension were largely under control. (Tr. 24) (citing Tr. 346 (noting that plaintiff's symptoms were likely anxiety-related); Tr. 347-48 (noting that plaintiff was "meeting . . . lipid targets" and setting an annual follow-up); Tr. 351 (noting that plaintiff's LDL "improved dramatically" and describing hypertension as "very well controlled"); Tr. 353 (reporting "normal" and "mild" echocardiogram findings); Tr. 663 (noting that plaintiff admitted to not exercising at all); Tr. 677 (describing hypertension as "well controlled," hyperlipidemia as good with the exception of one lipid count (HDL), and setting an annual follow up)).

Plaintiff nevertheless argues that "it is evident that [plaintiff] suffers from severe physical impairments consisting of Cerebral Palsy, Crohn's Disease, and several other problems with her bladder" resulting in a more limited residual functional capacity than what the ALJ assessed.

(Doc. 14 at PAGEID 996).  Plaintiff supports her argument by generally summarizing her urinary incontinence treatment (*see id.* at PAGEID 997) and concluding that "[b]ecause [plaintiff] requires relentless use of the bathroom as a result of her irritable bowel syndrome and many other bladder issues stemming from her Crohn's Disease and Cerebral Palsy, it is not possible for [plaintiff] to hold employment without having to take additional breaks throughout the work day."  (*Id.*).  Plaintiff also implies that this conclusion is supported by her testimony about leaving her McDonald's job in 2016 due to needing to take frequent, unscheduled restroom breaks.  (*See id.*; Tr. 89-90).  In fact, however, plaintiff testified that she did not return to McDonald's after taking family medical leave for "surgery for [her] bladder" *to alleviate these issues.*  (Tr. 90).  Plaintiff's testimony, therefore, does nothing to undercut the ALJ's conclusion that she "responded well to treatment [for bladder issues] and did not pursue substantial follow up as recommended. . . ."  (Tr. 23).

Plaintiff also critiques the ALJ's conclusion that her Crohn's disease "appears to be resolved. . . ."  (Tr. 23), relying on the following note from Dr. Mehta: "[Crohn's disease] [a]ppears to be stable.  Active disease *could cause* heme-positive stool and thereby causing anemia.").  (Tr. 620) (emphasis added).  Though plaintiff argues that the ALJ "refused to include" this evidence (Doc. 14 at PAGEID 997), the ALJ specifically referenced the record that she cites (*see* Tr. 23).  Moreover, this record does not prove that plaintiff's Crohn's disease is "still active," as argued by plaintiff (Doc. 14 at PAGEID 997), but rather shows that Dr. Mehta considered her prior history of Crohn's disease as he monitored her anemia.  In fact, Dr. Mehta recorded the next month that plaintiff's "stool fecal blood was negative[,]" suggesting (if

anything) that Crohn's disease was *not* active. (Tr. 621). Finally, plaintiff makes no effort to tie any particular effects of Crohn's disease, if it were active, to the applicability of the more restrictive hypotheticals posed to the VE at the administrative hearing. *Cf. Stanley v. Sec'y of Health & Hum. Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals. . . .") (citing *Hardaway v. Sec'y of Health & Hum. Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987)).

Lastly, plaintiff argues that the ALJ ignored her testimony that she could only lift 10 pounds. (*See* Tr. 97). The ALJ based his conclusion otherwise (finding she could lift and/or carry 20 pounds occasionally and 10 pounds frequently), however, on the partial weight afforded to the opinions of the state agency physicians that assessed plaintiff's physical impairments: Drs. Bucci and Freihofner. (*See* Tr. 24). Drs. Bucci and Freihofner each considered plaintiff's medical history and symptoms in giving their opinions. (*See* Tr. 110-11, 113-14, 117-18, 125-28, 131, 134-36). *See* 20 C.F.R. § 1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). *See also id.* at § 1527(c)(6) ("[W]e will also consider . . . the amount of understanding of our disability programs . . . that a medical source has. . . ."). There are no other medical opinions in the record that support *more* restrictions in plaintiff's residual functional capacity. Further, even if plaintiff's testimony regarding her lifting and carrying abilities is substantial evidence of a more limited residual functional capacity, the ALJ is not bound by this testimony in view of the state agency physicians' opinions. "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an

opposite conclusion.'"  *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

In sum, the ALJ relied on substantial evidence to conclude that the VE's expert testimony in response to the hypotheticals regarding additional unscheduled breaks, off-task percentage, and monthly absences did not accurately portray plaintiff's physical state.  *Cf. Lancaster v. Comm'r of Soc. Sec.*, 228 F. App'x 563, 573 (6th Cir. 2007) ("If the hypothetical question does not accurately portray Plaintiff's physical and mental state, the VE's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work.").  The ALJ's conclusion that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently is also supported by substantial evidence. Plaintiff's third assignment of error is therefore overruled.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner is **AFFIRMED** and this matter is **CLOSED** on the docket of the Court.

Date:   5/5/2021

Karen L. Litkovitz
United States Magistrate Judge